This is a suit under the Municipal Mechanics Lien Act, — R.S.2:60-180 et seq., brought by complainant, as subcontractor under Spiniello Construction Co. on a contract between that company as contractor and the Township of Hamilton, for the construction of a certain sewer. Defendant Standard Accident Insurance Co. is the surety on the performance bond of the contractor, Spiniello Co.
The suit involved, inter alia, a determination of the amount actually due and unpaid from the Township to the contractor, — the Township admitting that $71,378.40 was due and denying liability for any greater sum, whereas the Spiniello Co. claimed an additional amount of about $133,000 over and above the $71,378.40 admitted by the Township.
During the course of the proceedings it developed that there was no issue between the Spiniello Co. (nor its surety) and any of the lien claimants, and by agreement, and without prejudice as to the issues between the contractor and the Township, the latter paid over to the surety company the said sum of $71,378.40, and the surety paid all the lien claimants in full.
There is a counter-claim by the surety against the contractor for some $73,000 or more expended by the surety for the account of the contractor — based on the duty of the contractor to indemnify or reimburse the surety and on certain assignments made by the contractor to the surety of the moneys due or to grow due from the Township to the contractor.
There presently remains for determination, first, the amount due from the Township to the contractor; second, the amount due from the contractor to the surety; third, the amount of allowance to be made to the original complainant for costs and counsel fee; and fourth, the question of costs and counsel fees as between or among the Township, the contractor and *Page 4 
the surety. Of these, the second and fourth have not been argued, — and indeed the proofs are not complete in regard to the second.
The main issue is therefore the amount due to the contractor. The lump sum contract price was $478,900. It was contended by the contractor and the surety (see the answers to interrogatories) that the contractor became entitled to additional compensation for extra work and materials in the following items and amounts:
1. Vitrified Pipe Risers ......................... $1,166.00
2. Stone or gravel ............................... 208.00
3. Relaying 15 inch pipe on Right of Way ......... 1,237.37
4. House Connections ............................. 2,977.24
5. "Extra Work Items Allowed"
 a. Lumber ..................... $14,547.60
 b. Other items ................ 25,943.88
 __________ 40,491.48
6. Additional lumber ............................. 114.174.90
7. Six inch under-drain .......................... 5,457.50
 ___________
 $165,712.49

Of these the Township conceded that item 5-b $25,943.88, but contested all the others; and also counter-claimed against the contractor for $5,350 for liquidated damages under the contract for delay in completing the contract.
Toward the conclusion of the testimony a compromise was agreed upon by the parties as to items 1, 2, 3 and 4, whereby the Township admitted liability for one-half the amount of these items, or $2,794.30, and the contractor and surety waived claim for the other half.
The Township therefore admits that a total of $507,638.18 became due to the contractor. Concededly $510,069.01 has been paid to or for the account of the contractor, (which includes the $71,378.40 paid without prejudice after bill filed, as aforesaid). The Township claims therefore that there has been an overpayment of $2,430.83, and that this sum, together with the $5,350 damages claimed for delay, (or a total of $7,780.83) should be repaid by the contractor and/or the surety.
The contractor and surety on the other hand deny liability for the $5,350; and they claim that there became due to the *Page 5 
contractor, in addition to the $507,638.18, admitted by the Township as above set forth, the sum of $134,180 (being items 5a, 6 and 7 in the list hereinbefore set forth), or a total of $641,818.18, and that there is still due after deducting the payments of $510,069.01 already made, the sum of $131,749.17.
We have then the claims of the contractor (a) for lumber, $14,547.60; (b) for additional lumber, $114,174.90; (c) for under-drain, $5,457.50; and (d) the claim of the Township for $5,350 for delay.
Taking these up in inverse order; — it is deemed that the Township is not entitled to its claim for the $5,350. This is based on clauses in the contract documents providing for the assessment of liquidated damages at $50 per day for each day of delay in completion of the work. While contracts as to liquidated damages are enforceable where such damages are not a penalty but are really agreed on as being a fair and reasonable figure for actual damages not readily susceptible of exact ascertainment or proof, and while the contractor did not complete within the time specified by the contract and subsequent extensions, nevertheless it does not appear that there was any actual damage whatever from this delay, — indeed it is tacitly conceded that there was no such damage. This contract was one of several interrelated contracts involving a sewer system, and it would not have been possible for this sewer to be used prior to the completion of other contracts, even if this one had been completed earlier. Moreover the letter sent to Spiniello Co. by the architects and engineers on May 13th, 1940, was from an equitable point of view, tantamount to a statement that this sewer would be regarded as completed within time, if completed by May 31st, 1940; and it was completed on May 30th, 1940.
Next as to the contractor's claim for under-drains. Testimony on behalf of the contractor is that 4,366 lineal feet of six-inch tile underdrain was furnished and installed by the contractor at certain specified portions of the sewer. This testimony is not contradicted. The contractor's contention is that this material and labor was extra, — not comprised in the general contract, and that compensation should be paid *Page 6 
therefor by the Township, at the rate of $1.25 per foot (which concededly is the rate specified in the contract for extra work of this particular kind, when duly authorized.
The contract, Exhibit DS-1, on page 46 under the heading of "Equalizing Beds," contains the following provision:
"When running water, hard clay, sandstone, shale or other unyielding or unstable trench bottom is encountered, the pipe shall be laid on an equalizing bed of gravel, broken stone, or sand as ordered by the Engineer, but not less than eight (8") inch depth, measured directly under the outside center of the pipe, and extended to a height of one-third (1/3) of the internal diameter of the pipe, measured from the invert bottom. TheEngineer may direct that four (4") or six (6") inch Vitrified Farm Drain Tile or Porous Concrete Drain Pipe be placed in a gravel or broken stone equalizing bed if in his opinion he deemsit necessary. These items and quantities shall be furnished at the unit prices bid as an addition to the lump sum bid." (Italics supplied.)
The evidence shows that at the several places where the contractor claims this six-inch tile drain was put in, there was running water and unstable trench bottom, and written orders for the placing of equalizing beds of gravel were given by the engineer. Payment for such gravel was duly made or authorized. No such written orders however were given for the use of tile. Concededly the engineer did not direct that tile be used in these equalizing beds; on the contrary, Mr. Stickle, the contractor's engineer in charge of this construction, admitted in his testimony that he had asked for authority to put the tile in and that it was denied, and that the Township's engineers had always refused to approve payment for the tile.
Paragraph 10 of the contract provides that no claim for any additions to the contract sum, (the lump sum bid of $478,900) for extra work or change, shall be valid unless there be a written order from the owner (the Township) or the engineer authorizing such change or extra work involving additional cost.
Furthermore the specifications, — p. 47, tit. "Water Removals," — show clearly that the cost of under-drains, other than such as might be directed by the engineer, is to be borne by the contractor. *Page 7 
The situation therefore is simply this: the contractor was of opinion that tile should be used in addition to the gravel, whereas the Township was of opinion that tile was not necessary and refused to direct or authorize the contractor to put it in. Under these circumstances, if the contractor proceeded to put it in, (as apparently was done), it was done without authority and there is neither legal nor equitable basis entitling the contractor to any extra payment therefor.
The next issue is as to whether or not the contractor is entitled to the extra payments of $14,547.60 claimed by it for lumber sheathing (or sheeting) left in place because (it is claimed) it was necessary to leave it in place in order to protect the sewer and adjacent utilities (such as water mains, gas mains, c.).
It appears that this lumber sheathing is used, where the trench is of any considerable depth, to line the sides of the trench to keep the sides from falling in while the sewer is being installed. It is ordinarily driven down to, but not below, the level of the sewer pipe; and is ordinarily withdrawn after the sewer has been installed and the earth has been replaced in the trench. Where the soil conditions at the bottom of the trench are such that because of the character or nature of the soil and the presence or seepage of water, the trench bottom (on which the sewer pipe is to be laid) is "unstable," it is often necessary to drive the sheathing down below the "invert" (or bottom surface of the sewer pipe), and in such cases it is also usually or frequently necessary to leave in place the sheathing so driven, — in order that the installed sewer pipe will not be displaced or driven out of line by the movement and shifting of the unstable soil which would occur at the bottom of the trench if the sheathing were removed. In such cases the leaving in place is said to be for the protection of the sewer. It is also frequently necessary, under certain conditions of the soil and/or water and of nearness of adjacent "utilities" or structures, to leave the sheathing in place in order to avoid disturbance of such adjacent utilities or structures; and in such cases it is said to be left in place for the protection of adjacent utilities or other structures. *Page 8 
The plans which form a part of the contract show the location and length of the entire sewer and its branches. The contract is one by the terms of which the contractor agrees to construct the sewer in those locations, in consideration of the receipt of the lump sum price or bid. He contracts, — (see paragraph 2 of the contract; also first paragraph of Form of Bid), in consideration of the lump sum price to
"furnish all plant, labor, materials, supplies equipment and other facilities and things necessary or proper for or incidental to the work contemplated by the contract, plans and specifications."
Again, in paragraph 47 of the contract, —
"Unless otherwise stipulated, the contractor shall provide and pay for all materials, labor, water, tools, equipment, light, power, transportation and other facilities necessary for the execution and completion of the work."
And on page 64 of the Specifications, under the heading "Shoring and Sheathing" it is provided that:
"All faces of excavation shall be properly sheeted, timbered and braced where necessary to furnish suitable dry and safe working conditions * * *, to preserve the load capacity of the soil, to keep the excavation within the narrowest possible limits, and to protect any structures or paving adjacent or close to the trenches * * * from damage. * * * Any damage to the pipe lines or structures occurring through settlement, water or earth pressure, slides, caves, or other causes shall be repaired by the contractor without cost thereof to the owner (Township)."
"The contractor shall include in the base bid * * * the cost involved in the shoring, sheathing, bracing and timbering and the maintenance, c., of the sewer trenches and other excavations."
Obviously therefore it was the obligation of the contractor to furnish and place all of the sheathing necessary for the construction of the sewer as shown on the plans, — without being entitled to receive any additional payment therefor over and above the lump-sum contract price. This is conceded by the contractor, — who does not claim any extra payment for sheathing not left in place. The contractor's claim is for extra payment for all sheathing left in place, — and at the supplemental unit price of $90 per thousand board feet *Page 9 
provided in the contract as the price for extra sheeting and bracing furnished and placed, over and above the sheathing comprised in the original contract, plans and specifications.
In the first place, — assuming for the sake of argument, that the contractor is entitled to some extra compensation, over and above the lump sump contract price, for such sheathing as he is directed by the township engineer to leave in place, — it cannot possibly be true that the contractor is entitled to compensation at the rate provided in the supplemental unit prices for the furnishing and placing of extra, additional sheathing and bracing not contemplated by, nor required for, the sewer as shown in the original plans.
As we have already seen, the contractor is obliged under the contract, to furnish and place all necessary sheathing, as a part of the work he is to do for the lump-sum contract price. His compensation for the cost of procuring and installing this sheathing has therefore been included in the contract price (even if we assume that he is to be entitled to remove all of it or receive some extra compensation for that which he is ordered to leave in place).
The contract provisions for the supplemental unit prices (paragraph 14 of the contract) are that "should the amount of any item of the work be required to be increased or decreased * * * the supplemental unit prices will be the basis for the additional compensation, or for the deduction, for such increase or decrease in work." If the Township should make changes in the plans which increased the length of the sewer, the contractor would be entitled to additional compensation, at the supplemental unit rates, for the additional excavation and back-filling, the additional sewer pipes furnished and placed and the additional sheathing furnished and placed, required by the additional length of the sewer. Likewise if the Township by change in the plans, should shorten the length of the sewer, the Township would be entitled to a deduction from the contract price, based on the lessened amount of excavation, pipe, sheathing, c., at the same supplemental unit prices. But, assuming that the leaving of sheathing in place is to be considered as extra work for which extra compensation is to be paid, it is obvious that *Page 10 
the supplemental unit price for the furnishing and placing ofadditional sheathing was not intended to, and does not, apply to the situation of sheathing left in place.
There being no supplemental unit price for sheathing left in place, the contractor's extra compensation therefor, if he is entitled to it, — would have to be arrived at as provided in paragraph 10 of the contract, i.e., either by agreement between the Township and the contractor or on the basis of cost plus 15 per cent.
But is the contractor entitled to any extra compensation for sheathing left in place?
Assuredly there is no provision in the contract, nor the plans or specifications which provides expressly that the contractor shall receive any extra compensation for sheathing left in place.
On the contrary, the specifications expressly set forth, (page 46), that "no addition to the base bid will be allowed for any materials, equipment or labor used in performing any work hereunder unless it can be clearly shown to be beyond the scope and intent of the plans and specifications."
As already pointed out, — the contractor's obligation under the contract (see paragraphs 1 and 2, pages 14 and 15) is to furnish "all * * * materials, supplies, equipment and other facilities and things necessary or proper" for the construction of the sewer, — all for the contract price, without any extra compensation. Extra compensation (or decreased compensation) is provided for, (Contract, paragraph 4, page 15), only if the amount of any item of the work is required to be increased above (or decreased below) that shown by the plans and specifications.
Concededly the furnishing and placing of sheathing is included in the base bid (Specifications, page 65, top): and the contractor is entitled to no extra compensation therefor unless the amount of such sheathing is increased by changes which lengthen the lineal footage of the sewer as shown on the plans. This is true not only as to such sheathing as was not required to be driven down below the sewer, but also as to such sheathing as was required to be driven below the sewer in order to provide dry working conditions and avoid damage *Page 11 
to the sewer by "settlement, water or earth pressure, slides, caves or other causes." (Specifications, page 64, also page 47, title, "Water Removals.")
The contractor's obligation, under the contract, is to construct the sewer properly, to the satisfaction of the township engineers, and to guarantee it against defects in materials or workmanship for one year after completion, (Contract, paragraph 35, pp. 34 and 35); he is also obliged to see to it that adjacent property suffers no damage, (Contract, paragraph 19, p. 31, and Specifications, p. 48, tit. "Public Liability"). Hence, for such sheathing as the contractor leaves in place in order to avoid damage to the sewer itself or to adjacent utilities or other structures, no extra compensation is payable, — (unless the contract provides for such). The responsibility is that of the contractor, (see, also, Specifications, p. 64, top). If he thinks the removal of sheathing at certain points will not, or is not likely to, result in any damage to the sewer or to adjacent structures, he can take it out; if damage to the sewer or adjacent structures does result, he has to make it good. If there is any doubt in his mind, therefore, it is extremely improbable that he would remove it, — because the cost to him of repairing resultant damage would obviously far exceed the cost to him of leaving the sheathing in place. Even if the contractor thinks it would be safe to remove certain sheathing, the engineer, if he thinks otherwise, has the right to veto its removal, (Specifications, p. 65, top), — just as he has the right to disapprove any other work or materials which he deems unsatisfactory, (Contract, paragraph 35, p. 34).
It seems clear, therefore, that it must necessarily have been expected by the contractor that a very large part of the sheathing would be left in place, — particularly since he knew that the subsurface conditions as to soil and water in the locality through which this sewer was to be constructed, were such as would make it necessary or advisable for sheathing to be left in place. (Not only does the contractor warrant that he knows the subsurface conditions — Contract, p. 34, paragraph 31 (d), — but such actual knowledge is also admitted in the testimony of the contractor's witnesses.) *Page 12 
Since the contract makes no provision for any extra for sheathing left in place to protect the sewer or adjacent structures against damage, but on the contrary provides, as we have seen, that there shall not be any extra compensation paid therefor, the contractor should have included in his base bid a sufficient amount to compensate him for the sheathing, on the expectation that most of it would be left in place.
In all probability the contractor's bid was so based; and this is further corroborated by the fact that the supplemental unit price bid for additional sheathing over and above what was indicated by the plans, was $90 per M board feet. Concededly the cost, at the site, of new lumber for sheathing was approximately $40 per M board feet, so that the $90 price was obviously based on the theory or expectation that none of such additional sheathing would be salvaged by the contractor.
The contention of the contractor that extra compensation should be paid for sheathing left in place is based on the interpretation which the contractor says should be placed on the latter part of paragraph 4 of the contract. That provision reads as follows:
"Should the amount of any item of the work be required to be increased or decreased due to any unanticipated conditions encountered, or in the event that the Owner desires to make minor extensions to the sanitary facilities under construction, or should rock or unstable foundation be encountered or work omitted, the undersigned agrees that the following supplemental unit prices will be the bases of his compensation for or deduction, as the case may be, for such decrease or increase in work."
Then follows a list of various items and prices, which includes excavation and back-filling at various depths, various sizes of various kinds of pipe, rock excavation, wood piles, gravel, broken stone, c., including an item for "Sheeting Bracing,furnished and placed — per M-B.M., $90." (Italics supplied.)
It was at first contended that extra compensation was due under this clause, because "unanticipated conditions" had been encountered with respect to subsurface soil and water conditions, and that this had necessitated the leaving in place *Page 13 
of large quantities of sheathing which would not otherwise have been left in place. In view of the contractor's warranty of knowledge of subsurface conditions, — Contract, paragraph 31 (d), — and the testimony that the subsurface conditions encountered were of a kind which the contractor actually knew were likely to be encountered, such a contention was untenable and was abandoned by counsel.
The contention is still made, however, that extra compensation is payable, under the quoted clause, because unstable foundation was encountered, and that it was because of such unstable foundation that much of the sheathing had to be driven below the sewer and had to be left in place.
That unstable foundation was encountered, and that because thereof some sheathing was driven below the sewer and had to be left in place, appears by the proofs, beyond question; but it by no means follows that any extra compensation thereby became payable.
It must be confessed that the quoted provision might have been somewhat more aptly or grammatically phrased, but there can be no doubt but that the meaning thereof is the same as if it read as follows:
"Should the amount of any item of the work be required to be increased or decreased, due
(a) to any unanticipated conditions encountered, or
(b) to decision by the Township to make minor extensions, c., or
(c) to the fact that rock is encountered, or
(d) to the fact that unstable foundation is encountered, or
(e) to decision by the Township to omit some of the work, it is agreed that the following supplemental unit prices shall be the bases for additional compensation to the contractor, or deduction from the contract price, as the case may be, for such increase or decrease in work."
Now it is obvious that not all the supplemental items and prices are applicable to all of the five specified contingent causes of increase or decrease in the amount of the work. For instance, the encountering of rock would not increase the amount of sewer pipe required; presumably the only item of the work thereby increased would be excavation — and *Page 14 
the only supplemental unit price involved would be that specified for rock excavation, — although probably the amount of timber sheathing required would be correspondingly reduced, and a corresponding reduction, at the specified unit rate, be made from the contract price in that respect.
The unit price for furnishing and placing of sheathing would also be involved, if the Township decided to extend the sewer somewhat, or to shorten it somewhat. So also, doubtless, if a large underground stream were encountered (an unanticipated condition) which necessitated the use of additional sheathing — several thicknesses or layers, instead of the usual single thickness; or something of that kind. But obviously the unit price for "sheathing furnished and placed" applies only to some situation of that kind; it is made the basis for an extra compensation if extra, additional sheathing is required, or for a deduction from the contract price, if some of the contemplated sheathing be omitted. It is expressly for "the furnishing and placing of sheathing," and is a price which is more than double the purchase price of sheathing. It cannot be intended to be applicable as the basis for extra compensation for sheathing left in place. If the parties intended that the contractor should be entitled to some extra compensation for sheathing left in place, the price or rate of such compensation would be far, far less than the price for furnishing and placing of additional sheathing; it would be simply the approximate value of second-hand, salvaged sheathing.
But how does the condition of "unstable foundation" necessitate or require extra, additional sheathing? There is no proof whatever that it does. The utmost that could be said to be necessitated by unstable foundation would be the driving of the sheathing down an additional foot or eighteen inches below the depth to which it would be driven if the foundation were not unstable. There is no proof that this would require any additional lumber; the proofs show that much of the sheathing projects well above the ground surface level. Furthermore, — and conclusively, — there is not only no proof that additional lumber was required, there is not even any such claim made. The only claim made is that because of the *Page 15 
unstable foundation the contractor was prevented from removing the sheathing, (or some of it), which he was required by the contract to furnish and place, and which he had furnished and placed, as a part of the contract work covered by the contract price. How the contractor can seriously claim that he would be entitled to the same extra compensation for any lumber left in place as he would be for the furnishing and placing of extra, additional sheathing, is impossible to comprehend.
The amount of the item of furnishing and placing of sheathing, was not increased or required to be increased, by the unstable foundation encountered. The item of work which was contemplated by paragraph 4 of the Contract as susceptible of possible increase by reason of encountering unstable foundation, — and which in fact increased because of such unstable foundation, — was the amount of gravel or broken stone required to be used. Additional gravel or broken stone was required to be used to make a stable foundation for the sewer pipe at the places where unstable foundation was encountered. For such extra gravel or broken stone, the contractor was entitled to extra compensation, at the specified supplemental unit price rate, — and this has been allowed and paid.
In the view of this court the utmost that can even colorably be claimed by the contractor, is that the amount of the item of sheathing left in place was required to be increased by the fact that unstable foundation was encountered, and that the contractor is entitled to receive proper extra compensation for so much of the sheathing left in place as was actually left in place because, and solely because, of unstable foundation encountered.
If it were not for the second paragraph of item 4 of the Contract, hereinbefore quoted, there could be no doubt that the contractor would not be entitled to any extra compensation for any sheathing left in place; because, as hereinbefore pointed out, it is the obligation of the contractor, under the other provisions of the contract and specifications, and for no compensation in addition to the bulk contract price, to see to it that the sewer is properly constructed, and continues *Page 16 
in good condition for one year, and to see to it that no damage is occasioned to adjacent utilities or other structures.
Item 4 of the Contract, however, does provide that if any item of the work (comprised in the performance of the Contract) is required to be increased because of the encountering of unstable foundation, the contractor shall be entitled to extra compensation. The contract therefore obviously contemplates thatsome item or items of the work may be required to be increased because of the encountering of unstable foundation. Concededly, the specifications contemplate (p. 46) that the items of broken stone, or gravel, or drain title, may be required to be increased because of the encountering of unstable foundation; and concededly the item of gravel was increased because of unstable foundation encountered (and additional compensation for such increase was allowed and paid).
By the same token, if the item of sheathing left in placewas required to be increased, because of unstable foundation
encountered, it would seem clear that additional compensation for such increase should be allowed to the contractor, notwithstanding any actual or apparent inconsistency with provisions of the specifications, (for by paragraph 1 of the Contract, in the case of any such inconsistency, the provisions of the Contract govern and prevail over the provisions of the specifications), and notwithstanding no unit price therefor is specified in the supplemental list, (for the Contract contemplates, — paragraph 10, — that increased compensation may become due for items for which no supplemental unit prices have been specified, and provides for the determination of the amount of increased compensation in such instances).
The witnesses for the Township admit that where the soil conditions at the bottom of the trench are unstable, any sheathing which has been driven below the invert ought not to be removed, but should be left in place. Nevertheless in order to establish a right to additional compensation for any of such sheathing left in place, the contractor must show (a) that such sheathing was in fact driven below the invert; (b) that unstable foundations made it necessary to drive it *Page 17 
below the invert; and (c) that no other reason than unstable foundation made it necessary either to drive it below the invert or to leave it in place.
(There is a provision in the specifications, — p. 54, tit. "Timber and Lumber," — that
"The use of timber and lumber left in place may be necessitated by unforeseen developments during the progress of the work, particularly for pile-capping and decking, planking, sheeting and other timber uses."
It is not perceived however that this is in anywise material or applicable to the situation under discussion. This paragraph does not say that any extra compensation shall be payable in such cases; and moreover there is neither proof nor even claim, that any of the sheathing left in place for which claim is now made, was left in place because of any unforeseen developments.)
The claim of the contractor is for extra compensation for a total of 143,025 board feet of sheathing left in place, — (See Answers to Interrogatories, Exhibits 3 and VII). The testimony on behalf of the contractor is to the effect that 10 per cent. of this was left in place for the purpose of protecting adjacent utilities and other structures; and it was eventually conceded by counsel for the contractor that no claim for additional compensation could properly be made or allowed for this 10 per cent.
It is claimed that the other 90 per cent. was left in place solely for the protection of the sewer itself, — this would amount to about 128,723 board feet. It is claimed that over 81,733 board feet was left in place in Klockner Road, and that only a small part thereof was left for the protection of utilities and other structures. The proofs as a whole, however, show that throughout the greater part of Klockner Road there were utilities and other structures which made it necessary for the sheathing to be left in place. It also appears by the proofs as a whole that a great deal of the sheathing left in on Nottingham Way, claimed to be solely for the protection of the sewer itself, in fact was required to be left in place in *Page 18 
order to protect the street paving. Another discrepancy in the claims of and testimony for the contractor, is that it was said that sheathing was left in place in Newkirk Avenue, between Stations 13-29 and 13-92, for the protection of utilities; whereas it was shown that there were no utilities in or adjacent to that stretch of sewer.
However, let us assume that the contractor would be entitled to extra compensation for sheathing left in place, whether for the purpose of protecting the sewer or for the purpose of protecting utilities and other structures, if it was required to be left in place because of unstable foundation. There was testimony on behalf of the contractor that in all the places where the sheathing was left in place to protect the sewer, the soil at the bottom of the trench was "boiling sand." Not only was this denied by a number of witnesses on behalf of the Township, but buckets of the soil at the bottom of the trench in Klockner Road (where this "boiling sand" condition was said to have existed) were exhibited in court, and proved to consist of a composition of sand and gravel, which (it was testified and not contradicted) would not "boil," and which even if it contained water, would, if de-watered, make a very good foundation. (The contractor was obliged to de-water the trench at his own cost — Specifications, p. 47.)
Again, there was testimony on behalf of the contractor that all of the sheathing claimed to have been left in place solely for the protection of the sewer (the 90 per cent. above referred to) was sheathing which had been driven below the invert. The Township's witnesses on the other hand say that only a very little of the sheathing was driven below the invert. Corroboration of the Township's witnesses was provided by the digging up of sheathing at several points where the contractor claimed it had been driven below the invert and left in place solely to protect the sewer itself, and finding that it has not
been driven below the invert.
The Township's witnesses did say that in a few places in Grayson Avenue, sheathing had been driven below the invert, at points where equalizing beds of gravel were ordered. It does not appear how much sheathing was driven below the *Page 19 
invert at these points; and still further it does not appear that it was necessary that it should have been driven below the invert.
It is concluded, therefore, that except as hereinafter mentioned, the contractor is not entitled to any extra compensation for sheathing left in place, because, to say the least, he has not (except as to a nominal amount) borne the burden resting upon him to prove by the weight of evidence that the sheathing so claimed was driven below the invert, nor that even such as was driven below the invert was required to be so driven because of unstable foundation. Furthermore, it seems clear that the meaning and intent of the Contract, (see paragraph 10) is that for any item of increased work performed for which additional compensation is to be claimed, the contractor must have a written order or approval from the Township or the engineer. Except for two exhibits, about to be mentioned, nothing which could be claimed to be such has been shown by the evidence.
The contractor relies strongly on some nineteen so-called "work change orders" which were put in evidence, and which, it is contended, constitute such written orders or authorizations or approvals, as to sheathing left in place. For one thing, there are only two of them, considered even as "approvals" by the engineer, which even purport to show that the sheathing which they mention was required to be driven below the invert and left in place, because of a condition of unstable foundation. These are Exhibits DS-23 and DS-13, each of which involves 15,000 board feet of sheathing, or a total of 30,000 board feet. Some of the others say that "sheathing was necessary to protect the installed sewer and existing utilities," or words to similar effect, but this is of course far from saying that because of unstable trench bottom it was necessary to drive the sheathing to such depth as to prevent its being safely removed.
Still more important, not even the two exhibits mentioned purport to be orders signed by the Township or even by the authorization of the Township, and hence form no legal basis for the allowance of extra compensation. When it is considered *Page 20 
that the claim for extra pay for sheathing left in place amounts to over $114,000, or nearly 25 per cent. of the original contract price, the wisdom of, and the necessity for enforcing, the requirement of a written order under authority of the Township is apparent. In the absence thereof, no allowance can be made for even the 30,000 feet mentioned.
Furthermore, even if it were deemed that some allowance could and should otherwise be made as to this 30,000 feet, the only allowance which could be made, as hereinbefore stated, would be the cost or loss to the contractor of the value of 30,000 feet of salvaged sheathing, plus 15 per cent.; and there is nothing in the evidence upon which such salvage value can be determined.
Finally it is also deemed that the effort of the contractor in this proceeding to obtain, as additional pay for lumber left in place, an extra allowance of the full price of $90 per thousand as for additional new lumber furnished and installed, is such inequitable conduct, — unclean hands, — as might well, without more, warrant denial of relief even if some relief might otherwise have been given.
The fact that the Township, prior to the filing of the bill, had paid to the contractor in the partial payments made from time to time during the progress of the work, $5,225.13 more than the Township now claims was due to the contractor (disregarding for the moment the stipulation compromise of the items aggregating $5,588.61), and that this $5,225.13 was apparently paid on account of lumber left in place, does not preclude or estop the Township from its present claim that the contractor was entitled to such payment and that the Township is entitled to credit on account thereof or repayment thereof. The contract specifically provides, — paragraph 22, — that at the final payment "all prior estimates and payments including those relating to Extra Work shall be subject to correction."
It results that it must be adjudged that at the filing of the bill there was due from the Township to the contractor the sum of $66,153.27, plus $2,794.30 (the additional stipulated one-half of items aggregating $5,588.61) or a total of *Page 21 
$68,947.57 instead of the $71,378.40 which was paid, — without prejudice, — by the Township to the surety for the account of the contractor under the provisions of the order of November 6th, 1940; and hence the overpayment of $2,430.83 must be repaid to the Township by the surety.
As between the Township on the one hand and the contractor and the surety on the other, no costs will be awarded. Each side has been successful in contesting claims by the other.
The original complainant, Calabro Construction Co., lien claimant, however, seems clearly entitled to an allowance and award of costs and counsel fee, out of the "fund" of $68,947.57 (which normally would be paid into court), for the services in the institution and prosecution of this proceeding for the benefit of all the lien claimants. The Calabro Company's lien claim, admittedly due and owing, was for $4,578. The surety company opposes any allowance of counsel fee or costs on the ground that "no time was given to the surety company to arrange for the payment of the claims" of Calabro Co. and several other lien claimants represented by complainant's solicitors, and that the filing of the bill was unnecessary.
These objections are not valid. It appears that the Calabro Company's notice of lien claim was filed with the Township on May 22d 1940, and that at about the same time notice thereof was sent to the surety company; (and shortly thereafter similar action was taken as to the lien claims of three other claimants). The bill was not filed until October 11th. The surety had more than ample time to ascertain the justness and validity of these claims, and arrange to pay them, in advance of the filing of the bill. It does not appear that the surety company did anything at all along this line during all this time; or if it did, that it gave notice or assurance to complainant that it would pay the claims without any lien suit. Moreover complainant of course had the right to take advantage of the additional security afforded by the lien suit, instead of relying solely on the obligation of the surety company.
An appreciable portion of the services specified in the *Page 22 
affidavits by complainant's solicitors are quite outside this lien suit and of no benefit to any other claimants. It would seem that $500 would be a fair and reasonable counsel fee, and this will be allowed and awarded, together with complainant's costs, and the verified disbursements of $56.94, provided an itemized statement of such disbursements be filed so as to avoid duplication in the taxed bill of costs.
This award would ordinarly be paid out of "the fund in court," — the amount due from the Township to the contractor has already heretofore been paid over to the surety, the latter will be directed to pay this award direct to complainant.
As has already been mentioned, the surety counter-claimed against the contractor for reimbursement or indemnification for moneys heretofore, or hereafter to be, paid by the surety on the contractor's account; but the proofs are inadequate to show what amount if any is due to the surety in this behalf, — and no decree can be made on this issue, unless the parties agree and stipulate in regard thereto.
One thing more. The case was tried and argued on the basis,inter alia, of the claim by the Township that by the payment of the $71,378.40 which was made, without prejudice, during the progress of the suit, the Township had made an overpayment of $5,225.13 and was entitled to repayment thereof. That claim developed after the filing of the original answer by the Township, — which admitted that $71,378.42 was due from the Township to the contractor. That original answer was later amended so as to provide for the claim by the Township for the $5,350 liquidated damages, but the amendment failed to provide also for the claim for $5,225.13 for overpayment. The Township may have an order for further amendment of the answer in this behalf, but such order and such amendment must be filed before decree. *Page 23